# MORRISON MAHONEY LLP

COUNSELLORS AT LAW

250 SUMMER STREET
BOSTON, MA 02210-1181
617-439-7500

| | |
|---|---|
| **MASSACHUSETTS** BOSTON FALL RIVER SPRINGFIELD WORCESTER | **NEW HAMPSHIRE** MANCHESTER |
| | **NEW JERSEY** PARSIPPANY |
| **CONNECTICUT** BRIDGEPORT HARTFORD | **NEW YORK** NEW YORK |
| **ENGLAND** LONDON | **RHODE ISLAND** PROVIDENCE |

Joseph M. Desmond
Phone: 617-439-7554
Fax:    617-342-4935
jdesmond@morrisonmahoney.com

August 15, 2022

VIA E-MAIL: Ryan@russmanLaw.com

Ryan L. Russman, Esq.
Russman Law
14 Center Street
Exeter, NH 03833

Re:     Barron Estates of Leo J. and Anna M. v. Benchmark Senior Living, LLC d/b/a
        Greystone Farm at Salem
        Rockingham Superior Court, Docket No.: 218-2022-cv-00512
        Our File No.: 10088041

Dear Attorney Russman:

Enclosed please find a courtesy copy of Defendant, Benchmark Senior Living, LLC d/b/a Greystone Farm at Salem's Notice of Removal to the USDC of New Hampshire in connection with the above-referenced matter.

Should you have any comments or questions, please feel free to contact me.

Very truly yours,

*Joseph M. Desmond*

Joseph M. Desmond

JMD/mr
Enclosure

101358241

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

LINDA BARRON, INDIVIDUALLY AND AS
EXECUTRIX OF THE ESTATE OF LEO BARRON
AND THE ESTATE OF ANNA BARRON,

        Plaintiff,

                                     Docket No. 22-318

v.

BENCHMARK SENIOR LIVING, LLC D/B/A
GREYSTONE FARM AT SALEM,

        Defendant.

## NOTICE OF REMOVAL

To:    Judges of the United States District Court
       for the District of New Hampshire

Defendant Benchmark Senior Living LLC (Defendant) hereby files this Notice of Removal pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1442 & 1446 to the United States District Court for the District of New Hampshire. As grounds for this Notice of Removal, Defendant states as follows:

## I.   PROCEDURAL HISTORY

1. On or about June 28, 2022, Plaintiff Linda Barron, individually and as Executrix of the Estate of Leo Barron and the Estate of Anna Barron, filed a Civil Action Cover Sheet and Complaint and Demand for Jury Trial against Defendant, Benchmark Senior Living LLC, in the Superior Court Department of the Trial Court of the State of New Hampshire and for the county of Rockingham numbered as Civil Action 218-2022-CV-00512. Exhibit A (summons); Exhibit B (Complaint).

2. On or about July 14, 2022, Barron served a copy of the Complaint on the agent authorized to accept service on behalf of Benchmark Senior Living LLC. Exhibit C (Return of Service).

1

3. This Notice of Removal is timely filed, as Defendant filed same within thirty (30) days after receipt of the initial pleading, on July 14, 2022, setting forth the claims for relief upon which such action or proceeding is based as required by the provisions of 28 U.S.C. §1446(b). 28 U.S.C. §1446 (b); Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 347-48 (1999). By filing this Notice of Removal, Defendant does not intend, in any way, to waive or relinquish its right to seek to compel arbitration of Plaintiff's claims asserted in the Complaint pursuant to a binding and applicable arbitration agreement, and it reserves all rights with respect to the arbitration agreement and its right to arbitrate this matter. Further, by filing this Notice, Defendant does not waive any defenses, including, without limitation, lack of personal jurisdiction, improper venue or forum, all defenses specific in FRCP Rule 12, or any other defense.

## II.   PLAINTIFF'S CLAIMS

1. Plaintiff's Complaint raises several allegations regarding Leo and Anna Barron's contraction of COVID-19 while residents at an assisted living facility in New Hampshire operated by the Defendant and known as Greystone Farm at Salem and their subsequent death.

2. Plaintiff alleges that in late February/early March 2020, the Center for Disease Control (CDC) issued nationwide detailed infection prevention and control (IPC) protocols to healthcare providers and long-term care facilities in response to the COVID-19 pandemic. See Exhibit B, ¶11. It is alleged that the protocols required health care providers and workers to utilize personal protective equipment (PPE), including gowns, gloves, face shields, facemasks, and/or respirators and other equipment designed to prevent the spread of COVID-19. Id. It is also alleged that the protocols issued by the CDC required that aerosol generating procedures be administered in the patient's room and laid out a specific pre- and post-treatment disinfecting procedure.

3.  Plaintiff alleges that Defendant assured families of Greystone Farm at Salem that the community, including its residential care associates, clinical staff, and subcontractors, were all following the CDC IPC protocols. <u>Id</u>. at ¶12.

4.  Plaintiff further alleges that the staff at Greystone Farm at Salem negligently administered care to Leo and Anna Barron, including by interacting with them without always utilizing the proper PPE. <u>Id</u>. at ¶19. Additionally, it is alleged that Leo Barron's nebulizer was not properly administered and disinfected. <u>Id</u>.

5.  Plaintiff also alleges that the negligent actions of the staff at Greystone Farm at Salem were in violation of the CDC IPC protocols as well as Defendant's own internal COVID-19 countermeasure policies. <u>Id</u>.

6.  In addition, Plaintiff alleges that Defendant should have known of the vital importance of ensuring that COVID-19 did not spread within the assisted living facility and should have better implemented countermeasures for screening staff and vendors upon entrance to the facility. <u>Id</u>. ¶21.

7.  Plaintiff alleges that, due to Defendant's negligent administration and use of COVID-19 countermeasures and its decision making relating thereto, Leo and Anna Barron died.

## III.  JURISDICTION EXISTS UNDER 28 U.S.C. § 1332 (DIVERSITY OF CITIZENSHIP)

1.  Jurisdiction exists over this removed action, pursuant to 28 U.S.C. §1441 because this action could originally have been filed in the United States District Court, pursuant to 28 U.S.C.§ 1332(a)(1), on the basis that there is complete diversity of citizenship between the Parties, <u>Rollins Green MHP, L.P. v. Comcast SCH Holdings, LLC</u>, 374 F.3d 1020, 1022 (1st Cir. 2004), and the amount in controversy exceeds $75,000, <u>Amoche v. Guarantee Trust Life Ins. Co.</u>, 556 F.3d 41 (1st Cir. 2009), <u>see</u> <u>also</u>, <u>Mutual Real Estate Holdings, LLC v. Houston Cas. Co</u>., 10-cv-236-LM, 2010 WL 3608043, (D.N.H, Sept. 13, 2010). As outlined below:

3

a. Defendant Benchmark Senior Living LLC is a limited liability company. The two members of Benchmark Senior Living LLC are The Anne E. Grape 2000 Trust and The Thomas H. Grape 2016 Family Trust. The sole trustee of the Anne E. Grape 2000 Trust is Anne Grape who is a citizen of Massachusetts. The sole trustee of the Thomas H. Grape 2016 Family Trust is Thomas Grape who is a citizen of Massachusetts. The citizenship of the Anne E. Grape 2000 Trust and the Thomas H. Grape 2016 Family Trust is determined by the domicile of the trustees, pursuant to the jurisdictional analysis of Americold Realty Trust v. Conagra Foods, Inc., 136 S. Ct. 1012 (2016).

b. Based on the jurisdictional analysis of Defendant set forth in Carden v. Arkoma Associates, 949 U.S. 185 (1990), and Americold Realty Trust v. Conagra Foods, Inc., 136 S. Ct. 1012 (2016), the named Defendant is a citizen of Massachusetts for purposes of this Court's subject matter jurisdiction based on diversity.

c. Based on the Complaint, the Plaintiff, is an individual that resides in New Hampshire. Exhibit B, ¶1.

d. Based on the Complaint, the decedents, Leo and Anna Barron, were individuals who resided in New Hampshire at the time of their deaths. Exhibit B, ¶1.

e. In the Complaint, Plaintiff has alleged that as a result of negligent care administered to Leo and Anna Barron by the staff in Defendant's facility, they contracted COVID-19 and died. It is alleged that both Leo and Anna Barron suffered severe pain, anxiety, mental distress and death. Exhibit B, ¶¶ 19-22. The Plaintiff seeks damages for economic loss to the estates, conscious pain and suffering, medical bills, and funeral expenses. Id.

4

f.  To meet the jurisdictional requirement set forth under 28 U.S.C. 1332(a), there must exist a "reasonable probability" that the amount in controversy exceeds $75,000. Amoche, Supra, at 480-49. see also Mutual Real Estate Holdings, Supra, at 2. Given that Plaintiff has brought a wrongful death suit for the death of both of her parents, and the allegation of damages for economic loss to the estates, conscious pain and suffering, medical bills, and funeral expenses, it is reasonable that the amount in controversy for total damages exceeds $75,000. See, Exhibit B.

2. Because complete diversity of citizenship exists between Plaintiff and Defendant, and as the amount in controversy exceeds the sum of $75,000, removal is proper pursuant to 28 U.S.C. §1446.

3. The United States District Court for the District of New Hampshire is the proper forum for removal pursuant to 28 U.S.C. §§101 and 1441(a), as the civil action is pending in Rockingham County, New Hampshire.

4. Defendant will promptly provide written notice of the removal of this action, pursuant to 28 U.S.C. § 1446(d), to Plaintiff and to the Clerk of the Superior Court Department of the Trial Court of the State of New Hampshire in and for the County of Rockingham.

5. Pursuant to Local Rule 81.1, Defendant will request of the Clerk of the Superior Court Department of the Trial Court of the State of New Hampshire in and for the county of Rockingham certified or attested copies of all docket entries therein and file same with this Court with fourteen (14) days after filing the Notice of Removal.

6. Complete diversity jurisdiction exists in this matter, and this case is therefore removable to the District Court for the District of New Hampshire.

**IV.     JURISDICTION EXISTS UNDER 28 U.S.C. § 1331 (FEDERAL QUESTION)**

Although complete diversity is clear, and no further basis for removal is necessary, it is important to illustrate that this case is also removable under 28 U.S.C. § 1331. The case is removable under 28 U.S.C. § 1441(a) on the basis of original jurisdiction because Plaintiff's Complaint asserts a claim "arising under" federal law within the meaning of 28 U.S.C. § 1331 by virtue of complete preemption under the Public Readiness and Emergency Preparedness ("PREP") Act.

> **a.  Plaintiff's State Law Cause of Actions are Completely Preempted by the PREP Act**

1.  Complete preemption is an exception to the well-pleaded complaint rule. See Metro-Life Ins. Co. v. Taylor, 481 U.S. 58, 64 (1987).

2.  Complete preemption occurs when the "pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law Complaint into one stating a federal claim for purposes of the well-pleaded Complaint rule." Caterpillar Inc. v. Williams, 482 U.S. 386, 393 (1987) (quotation omitted); Metro-Life, 481 U.S. at 63-64 (complete preemption exists when the preemptive force of federal law is so powerful that it displaces any state law cause of action and leaves room only for a federal claim for purposes of the "well-pleaded complaint" rule).  Complete preemption requires that the Defendant show "Congress clearly intended to supersede state authority." Id. at 65-66.

3. "[C]omplete preemption is not a defense. It means that the claim itself arises under federal law for purposes of the well-pleaded complaint." Rueli v. Baystate Health, Inc., 835 F.3d 53 (1st Cir. 2016). "Once an area of state law has been completely preempted, any claim purportedly based on that pre-empted state law is considered … a federal claim, and therefore arises under federal law." Caterpillar, supra, at 393. When a state law claim is recharacterized as a federal claim, through the doctrine of complete preemption, the federal court has exclusive jurisdiction. Fayard v. Northeast Vehicle Services, LLC, 533 F.3d 42, 45-46 (1st Cir. 2008).

6

4. The PREP Act, enacted on December 30, 2005, is a unique statutory scheme that lies dormant until it is invoked by the Secretary of the U.S. Department of Health and Human Services ("HHS") (the "Secretary") at the time of a public health emergency. Congress enacted the PREP Act to encourage and coordinate a thorough, rapid, and comprehensive response to declared public health emergencies. 42 U.S.C.A. § 247d-6d(b). It grants broad immunity to covered persons, such as front-line healthcare workers and other entities who deploy approved countermeasures, from suit and liability for claims of loss related to the administration or use of covered countermeasures so that they may combat the emergency without fear of later litigation.

5. The PREP Act authorizes the Secretary to issue a Declaration, subject to amendment, that a specified disease or condition is a public health emergency for a certain time-period. Once made, the Declaration grants liability immunity to "covered persons" against any claim of loss caused by or relating to the use of identified countermeasures.

6. The Declaration under the PREP Act must specify the covered countermeasures identified to respond to the declared public health emergency for which immunity is granted. Once the Declaration is made, a covered person *shall* be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure. 42 U.S.C.A. § 247d-6d(a)(1) (emphasis added).

7. Under the Act, immunity applies "to any claim of loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure." 42 U.S.C.A. § 247d-6d(a)(2)(B).

8. On March 10, 2020, the HHS Secretary issued the required Declaration invoking the PREP Act for the COVID-19 pandemic, effective February 4, 2020, determining that "the spread of SARS-

7

CoV-2 or a virus mutating therefrom and the resulting disease COVID 19 constitutes a public health emergency."[1] The Declaration delineated that the PREP Act's immunity from suit and liability was in effect for the distribution, administration, or use of one or more covered countermeasures and recommended the administration and use of "Covered Countermeasures" to combat COVID-19.

9. The COVID-19 Declaration has been amended ten times, each time broadening the scope of the PREP Act as applied to the emergency response to this unique global pandemic with the last several amendments issued under the Biden Administration and confirming the breadth of the Act and its complete preemptive effect on state law claims.[2]

10. The PREP Act also expressly preempts any claim filed in state court for negligence or violation of state law that arises out of the administration or use of covered countermeasures through the creation of an exclusive federal cause of action. The preemption language is unequivocal, *to wit*: "no State or political subdivision of the State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirements that — (A) is different from, or is in conflict with, any requirement applicable under this section; and (B) relates to the ... use ...or administration by qualified persons of the covered countermeasure...." 42 U.S.C.A. § 247d-6d(b)(8).

---

[1] Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 FR 15198-01 (March 10, 2020) ("Declaration" or "COVID-19 Declaration").

[2] *See, e.g.,* Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 FR 21012-02, at 21013-14 (April 15, 2020) [adding approved respiratory devices to list of covered countermeasures, pursuant to CARES Act]; Second Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID- 19, 85 FR 35100-01, at 35101-02 (June 8, 2020) [clarifying that covered countermeasures include countermeasures that "limit the harm COVID-19 ... might otherwise cause."]; Third Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 FR 52136-01 (Aug. 19, 2020) [declaring that categories of disease representing a public health emergency include not only to COVID-19, but also "other diseases, health conditions, or threats that may have been caused by COVID-19 ...."]; Fifth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, available at https://www.phe.gov/Preparedness/legal/prepact/Pages/COVID-Amendment5.aspx (January 28, 2021 [adding additional categories to the definition of "qualified persons," including professionals qualified to administer the COVID-19 vaccine under the laws of any state].

11. The exclusive remedy for death or serious injury resulting from the administration or use of a covered countermeasure is a fully-funded, no-fault-type compensation program designated by Congress as the "Covered Countermeasure Process Fund" (the "Fund"). 42 U.S.C.A. § 247d-6e. The Fund, similar to Workers' Compensation or the National Vaccine Injury Compensation Program, was established to provide timely, uniform, and adequate compensation to eligible individuals for covered injuries in place of expensive and uncertain litigation. The "sole exception to the immunity from suit and liability of covered persons" provided in the PREP Act is a federal cause of action brought for death or serious physical injury resulting from willful misconduct, as statutorily defined, which suit must be brought in the U.S. District Court for the District of Columbia after exhaustion of remedies under the Fund. 42 U.S.C.A. § 247d-6d(d)(e). State causes of action for claims relating to covered countermeasures are impermissible, as the PREP Act substitutes an exclusive federal cause of action and federal claims process in place of all state claims relating to the use and administration of covered countermeasures.

12. Thus, the PREP Act creates an exclusive federal cause of action for the claims asserted by plaintiff and the procedures and remedies governing the cause of action. Therefore, where a cause of action falls within the scope of the PREP Act, the Act completely preempts that cause of action and confers federal subject matter jurisdiction thereon. It does not matter whether the complaint expressly raises a federal claim. Rather, the doctrine of complete preemption "converts [plaintiffs'] ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." Metro. Life, 481 U.S. at 65.

13. In the First and Second Advisory Opinions concerning the PREP Act Declaration with respect to COVID-19, the HHS Office of General Counsel ("OGC") confirms that the express preemption language in the PREP Act "sweeps widely" and should be broadly interpreted. *See* Advisory Opinion, p. 2; Advisory Opinion 20-02, p. 4. The Opinions also recognize that the PREP

9

Act is a complete preemption statute because the only viable cause of action under the Act lies in the United States District Court after a claim is filed with the Fund; moreover, COVID-related claims, such as Plaintiff's, also raise substantial federal questions under the Supreme Court's <u>Grable</u> doctrine. Advisory Opinion 21-01.

14. Significantly, the Fourth Amendment to the Declaration, issued on December 3, 2020, directs that the PREP Act be construed in accordance with all the Advisory Opinions on the PREP Act issued by HHS and fully incorporates those Opinions into the Declaration.[3] This Amendment also makes explicit that "administration" of covered countermeasures means not only the physical provision of countermeasures to recipients, but also "activities and decisions directly relating to public and private delivery, distribution and dispensing of the countermeasures to recipients, management and operation of countermeasure programs, or management and operation of locations for the purpose of distributing and dispensing countermeasures." <u>Id</u>., sec. IX. The Amendment further explicitly provides that claims regarding the failure to administer a covered countermeasure may also implicate the PREP Act. <u>Id</u>.

15. This Opinion also highlights the "relating to" language of the Act and explains that any "black-and-white" view that the PREP Act only applies to use versus non-use is in direct contravention of the plain language of the PREP Act, which extends immunity to anything "relating to" the administration of a covered countermeasure. <u>Id</u>. at p. 3. The Opinion asserts that the Secretary's COVID-19 Declaration includes both action and inaction with respect to covered countermeasures against COVID-19, and is critical of decisions that may limit application of the PREP Act to allegations of "use." Indeed, HHS explained there that any such "black and white" view

---

[3] Fourth Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 FR 79190 (Dec. 3, 2020) ("Fourth Amendment").

clashes with the plain language of the PREP Act, which extends immunity to anything "relating to" the administration of a covered countermeasure." Id. at pp. 2-3. This Opinion also highlights the importance of "program planners" in the emergency response to COVID-19, confirming that "decision-making that leads to the non-use of covered countermeasures by certain individuals is the gist of program planning, and is expressly covered by PREP Act." Id. at p. 4. (emphasis added).

16. The Advisory Opinions issued by the HHS OGC, which have been incorporated into the Secretary's Fourth Amendment to the Declaration for the purpose of its construction, illustrate the expansive scope of the PREP Act and its protections for individuals and organizations that administer or use covered countermeasures to combat COVID- 19.

17. The Fifth Advisory Opinion, issued on January 8, 2021, is particularly significant because it addresses exclusive federal jurisdiction in cases invoking the PREP Act and further confirms that the PREP Act applies to suits concerning the non-use of covered countermeasures against COVID-19. In this Opinion, HHS explains that the "PREP Act is a 'Complete Preemption' Statute," stating:

> [t]he *sine qua non* of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court. The PREP Act does both.

> Once complete preemption attaches, the district court is usually obligated to dismiss the case as pleaded, either because no federal cause of action is alleged or the exclusive initial venue is a federal administrative agency.[4] (emphasis in original).

18. The HHS Secretary's Declaration is controlling and cannot be reviewed by express directive of Congress. Indeed, the PREP Act provides that "[n]o court of the United States, or of any State, shall have subject matter jurisdiction to review, whether by mandamus or otherwise, any action

---

[4] *See* Advisory Opinion 21-01 on the Public Readiness and Emergency Preparedness Act Scope of Preemption Provision, p. 2, available at https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2101081078-jo-advisory-opinion-prep-act-complete-preemption-01-08-2021-final-hhs-web.pdf (January 8, 2021) ("Advisory Opinion 21-01").

128642444v.1
101356871

by the Secretary under this subsection." 42 U.S.C. § 247d-6d(b)(7). It is clear that Congress intended for the Secretary's Declaration (and any amendments thereto) to have the force of law.

20. In <u>Rachal v. Natchitoches Nursing & Rehabilitation Center, LLC</u>, the Court held that the PREP Act is a complete preemption statute and that it "exclusively encompass[es] claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure." <u>Rachal v. Natchitoches Nursing & Rehabilitation Center, LLC</u>, No. 1:21-cv-334 at n. 3 (W.D. La. Apr. 30, 2021). Such holding is persuasive here.

**b. The Defendant is a covered person under the Act**

1. The PREP Act defines a "covered person" entitled to immunity to include a "program planner" and a "qualified person" who administers or dispenses covered countermeasures. 42 U.S.C.A. § 247d-6d(i).  Benchmark is a "program planner" and therefore a "covered person" under the Act.

2. Program planners are those who "supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure ...." <u>Id.</u> § 247d-6d(i)(6). Stated simply, "[a] program planner is someone who is involved in providing or allocating covered countermeasures." Advisory Opinion 21-01.

3. Defendant supervised and administered COVID-19 infection control countermeasure programs (ICP) required by CDC and New Hampshire law, provided a facility where covered countermeasures were administered, was involved in providing or allocating covered countermeasures, and implemented policies and procedures to effectuate the CDC's IPC protocols regarding such countermeasures. Additionally, Benchmark supervised and administered its own

COVID-19 infection control countermeasure policies and procedures to combat the spread of the virus. As such, Benchmark is clearly a program planner under the Act. See 42 U.S.C. § 247d-6d(a)(1) (providing that a program planner supervises or administers a program with respect to a "security countermeasure or a qualified pandemic or epidemic product," further described as a drug, biological product, or device); Garcia v. Welltower OpCo Grp. LLC, 522 F. Supp. 3d 734 (C.D. Cal. 2021) (finding senior living community was a "program planner" under PREP Act); Compl., at ¶ 12 (alleging Benchmark issued regular COVID-19 email bulletins to residents and family members, acknowledged CDC's protocols and assured residents and family members that its residential care attendants, clinical staff and subcontractors were all following the CDC's IPC protocols).

4. Plaintiff's claims arise out of the administration and use of multiple "covered countermeasures" to combat COVID-19, which triggers complete preemption under the PREP Act.

### c. Plaintiff's Claims Arise from Defendant's Use and Administration of Covered Countermeasures

1. The PREP Act covers not only the physical administration and use of covered countermeasures to combat COVID-19, but also extends to "any activity that is part of an authorized emergency response [to COVID-19] at the federal region, regional, state, or local level." 42 U.S.C.A. § 247d-6d(a)(2)(B); Advisory Opinion, p. 2. This includes decisions related to the use and administration of covered countermeasures, including PPE, to prevent community-based transmission of COVID-19 to others, as well as decision making concerning the operation and management of a countermeasure program and facility. Advisory Opinion 20-04. Indeed, the COVID-19 Declaration "broadly extends PREP Act immunity" to include both action and inaction with respect to efforts to prevent community-based transmission of COVID-19, and the Fifth Advisory Opinion confirms that the plain language of the PREP Act extends immunity "to anything 'relating to' the administration of a covered countermeasure."" See Advisory Opinion 20-03, p. 2; Advisory Opinion 21-01, p. 3.

13

2. As noted herein, among the covered countermeasures included in the PREP Act are: "a qualified pandemic or epidemic product;" "a security countermeasure;" a drug; and a biologic product, all as defined by federal law, and therapeutics and devices that have been authorized for emergency use in accordance with the Federal Food, Drug, and Cosmetic Act. Additionally, unique to the response to COVID-19, respiratory protective devices were added to the list of covered countermeasures by CARES Act. See 42 U.S.C.A. § 247d-6d. Indeed, under the PREP Act and the Secretary's initial Declaration, "covered countermeasures" included any qualified pandemic or epidemic product; and any drug, biologic, product or device. A "qualified pandemic or epidemic product" is defined as a drug, biologic product or device, which is a product manufactured, used, designed, developed, modified, licensed, or procured to diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic; or to limit the harm such pandemic or epidemic might otherwise cause. The Declaration also included as a covered countermeasure "any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, or any device used in the administration of any such product, and all components and constituent materials of any such product." See 85 Fed. Reg. at 15, 199-15, 1200[5].

3. Benchmark's care of Plaintiff's decedents implicated decisions regarding the use of PPE, screening and testing for COVID-19, and other countermeasures designed to limit the infection and spread of COVID-19, pursuant to its adoption of the CDC's IPC protocols. Stated differently, Benchmark and its employees engaged in affirmative acts to seek to prevent the spread of COVID-

---

[5] On June 4, 2020, the Secretary further amended the March 10, 2020 Declaration to clarify that covered countermeasures under the Declaration include qualified products to limit the harm COVID-19 might otherwise cause. This amendment was effective as of February 2, 2020. 85 FR 21012.

19 in its facility with covered countermeasures under the PREP Act as well as decision making relating to how and when those countermeasures were allocated and used at the facility.

4. While Plaintiff claims that Benchmark was negligent in its use of these countermeasures, Benchmark's decision-making relating to the use, administration, and management of covered countermeasures in caring for Plaintiff's decedents and other residents at its facility to prevent transmission of COVID-19 trigger the protections afforded under the PREP Act. See Advisory Opinion 21-01.

5. Plaintiff's alleged injuries and death from COVID-19 arise out of, relate to, and result from the manner in which Defendant administered and used covered countermeasures. See 42 U.S.C. § 247d-6d(a)(1).

6. The Complaint details infection control measures and procedures at the facility including utilization of PPE, including facemasks and respirators, disinfecting and treatment procedures designed to limit the spread of COVID-19, as well as program planning including, inter alia, staff screening that implicates countermeasures such as thermometers and social distancing.  Compl., at ¶¶ 11, 21. The Complaint references Benchmark's adoption of the CDC's IPC policies, including those concerning the use of PPE (including facemasks and respirators), id. at ¶ 12, but alleges Benchmark negligently failed to follow these policies consistently, including by way of improper use and sometimes non-use of PPE, id. at ¶ 19; and Plaintiff otherwise criticizes Defendant for the manner in which it screened persons in the facility for COVID-19 which is done by way of thermometer countermeasures. See id. at ¶ 21.

7. These allegations of use and misuse of PPE and the infection control measures directly relate to covered countermeasures within the meaning of the PREP Act. See Advisory Opinion 21-01 ("Program planning inherently involves the allocation of resources and when those resources are scarce, some individuals are going to be denied access to them. Therefore, decision-making that leads

15

to the non-use of covered countermeasures by certain individuals is the gist of program planning, and is expressly covered by PREP Act.); Garcia, 522 F. Supp. 3d at 744 (finding allegations of use and misuse of PPE and the infection control measures directly relate to covered countermeasures within the meaning of the PREP Act); Wilhelms v. Promedica Health System, Case No. G-4801-CI-202003713 (Cook, J.) (March 23, 2022) (PREP Act "applies to any claim for loss that has a *causal relationship* with the administration to or use by an individual of a covered countermeasure.")

### d. There is a Causal Relationship Between the Administration or Use of Covered Countermeasures and the Claims of Loss

1. Under the Act, immunity applies "to any claim of loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure." 42 U.S.C.A. § 247d-6d(a)(2)(B). "Claims of loss" under the Act are broad and include any type of loss, including death; physical mental, or emotional injury, illness, and disability; fear of physical, mental, or emotional injury, illness, disability, or condition, including any need for medical monitoring; and loss of or damage to property. 42 U.S.C.A. § 247d-6d(a)(2)(A).

2. The Declaration defines the "administration" of covered countermeasures to include the: "physical provision of the countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution, and dispensing of the countermeasures to recipients...." *Id.,* sec. IX. Administration also includes activities related to "management and operation" of countermeasure programs or facilities."

The Declaration states:

[c]laims for which Covered Persons are provided immunity under the Act are losses caused by, arising out of, relating to, or resulting from the administration to or use by an individual of a Covered Countermeasure consistent with the terms of a Declaration issued under the Act. Under the definition, these liability claims are precluded if they allege an injury caused by a countermeasure, or if the claims are due to manufacture, delivery, distribution, dispensing, or management and operation of countermeasure programs at distribution and dispensing sites.

3. Plaintiff's allegations of misuse of PPE and its other COVID-19 infection control countermeasures implicate the PREP Act. See Advisory Opinion 21-01 ("Program planning inherently involves the allocation of resources and when those resources are scarce, some individuals are going to be denied access to them. Therefore, decision-making that leads to the non-use of covered countermeasures by certain individuals is the gist of program planning, and is expressly covered by PREP Act.).

4. Plaintiff's complaint arises from and relates to Defendant's conduct as program planners and their decision making with respect to administration of COVID-19 covered countermeasures, which fall directly within the scope of the PREP Act.

5. Plaintiff alleges that Defendant improperly implemented the CDC IPC protocols and its own internal policies relating to countermeasure use and administration thereby causing the death of Leo and Anna Barron. Plaintiff's claim of loss is thus clearly related to Defendant's administration and use of covered countermeasures and has the requisite causal relationship under the PREP Act.

## V.     JURISDICTION EXISTS UNDER 28 US.C. § 1442 (FEDERAL OFFICER)

1. This Court also has jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which allows claims asserted against someone who is under color of federal authority, to be removed to federal court. Here, the government's efforts to control the COVID-19 pandemic involved specific directives to assisted living facilities which were critical in helping to carry out the federal effort to treat and prevent the spread of COVID-19.

2. Federal officer removal is warranted because Defendant's response to the pandemic, and the care provided to its residents during the state of emergency, was at the specific direction and oversight of the federal government, including HHS and the Center for Disease Control and Prevention.

17

3. A civil action that is commenced in the state court and that is directed at the United States or any agency thereof or any officer of the United States, or any person acting under that officer, for or relating to any act under color of such office, may be removed to the District Court of the United States. 28 U.S.C. § 1442(a)(1).

4. The statute creates the ability to remove suits against federal officers despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law. See Jefferson Cnty., Ala. v. Acker, 527 U.S. 423, 431 (1999).

5. Removal is appropriate when the moving defendant establishes (1) that it was "acting under a federal officer's authority"; (2) that the charged conduct was carried out for or relating to the asserted official authority; and 3) that it will assert a colorable federal defense to the suit. Moore v. Electric Boat Corporation, 25 F.4th 30, 34 (1st Cir 2022).

6. Defendant is part of the United States' "critical infrastructure." It acted on behalf of the federal government and carried out government duties to stop the spread of Covid-19. Defendant's designation as "critical infrastructure" is sufficient for federal officer jurisdiction when it was, *inter alia*, closely monitored by federal agencies. Fields v. Brown, 2021 WL 510620, *3 (E.D. Tex. Feb. 11, 2021) (finding federal officer jurisdiction in case where meatpacking plan was deemed "critical infrastructure" and interacted heavily with USDA and FSIS to guarantee adequate food supply during pandemic). The Healthcare and Public Health Sector is a critical infrastructure,  which creates a shared responsibility between itself and the owners and operators (Defendant) to promote the Nation's safety, prosperity and well-being.[6]

---

[6] See Presidential Policy Directive – Critical Infrastructure Security and Resilience, The White House (Feb 12, 2013), available at https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil.

7. Here, Defendant meets all the requirements for federal officer jurisdiction under section 1442(a)(1). Defendant is a "person," which includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. §1.

8. As part of the "critical infrastructure," Defendant was "acting under" authority of a federal officer when it engaged in the alleged tortious conduct. The United States Supreme Court has held that the phrase "acting under" involves "an effort to assist, or help carry out, the duties or tasks for the federal superior." Watson v. Philp Morris Cos., 551 U.S. 142, 152 (2007); See also, Rhode Island v. Shell Oil Products Co., LLC, 979 F.3d 50, 59 (1st Cir. 2020) ("[A]cting under connotes "subjection, guidance, or control" and involves "an effort to assist, or help to carry out, the duties of the federal supervisor").summarily vacated on other grounds. The "acting under" requirement is broad and is to be liberally construed. Watson, Supra, at 147; see also, Moore, Supra, at 34.

9. Defendant meets the "acting under" prong for removal based on the federal officer removal statute. Here, Plaintiff asserts that Defendant failed to properly comply with IPC protocols issued by the CDC to mitigate the spread of the COVID-19 virus. Plaintiff alleges that in late February/early March 2020, the CDC issued nationwide, detailed, infection prevention and control (IPC) protocols to healthcare providers and long-term care facility in response to the COVID-19 pandemic. See Exhibit B, ¶11. It is alleged that the protocols required health care providers and workers to utilize PPE, including gowns, gloves, face shields, facemasks, and/or respirators and other equipment designed to prevent the spread of COVID-19. Id. It is also alleged that the protocols issued by the CDC required that aerosol generating procedures be administered in the patient's room and that a specific pre- and post-treatment disinfecting procedure be followed.

10. Plaintiff admits that Defendant issued regular COVID-19 email bulletins to residents and family members, acknowledged CDC's protocols and assured residents and family members that its

residential care attendants, clinical staff and subcontractors were all following the CDC's IPC protocols. Compl., at ¶ 12.

11. As recognized by HHS Secretary Azar in his Fourth Amendment Declaration: "COVID-19 is an unprecedented global challenge that requires a whole-of-nation response that utilizes federal-, state-, and local-distribution channels as well as private-distribution channels [for the provision of covered countermeasures]." 85 Fed. Reg. at 79, 194.

12. Below are some of the directives issued by the CDC, as referenced in Plaintiff's Complaint, which provided authority from the federal government to long-term care providers, including Defendant, regarding its care and treatment of residents, including Plaintiff's decedents, in an effort to stop the spread of COVID-19.

   a. As early as February 1, 2020 the CDC began issuing directives and guidance to state and local health departments regarding the COVID-19 virus and how to screen patients for exposure and symptoms. The CDC acknowledged that the goal of the ongoing "US public health response is to identify and contain this outbreak and prevent sustained spread" of COVID-19[7].

   b. At that time, the New Hampshire Department of Health and Human Services (NHDHHS) began issuing Health Alerts to provide guidance and instruction to citizens, health care providers, and long term care facilities regarding the spread of COVID-19. On February 1, 2020, the NHDHHS stressed that the US DHHS was escalating the national response to COVID-19.[8] The health alerts

---

[7] Centers for Disease Control and Prevention, Update to Interim Guidance on Outbreak of 2019 Novel Coronavirus (February 1, 2020) (available at https://emergency.cdc.gov/han/HAN00427.asp).

[8] N.H. Department of Health and Human Services, 2019 Novel Coronavirus (2019-nCOV) Update #3 (February 1, 2020), https://www.COVID19.nh.gov/sites/g/files/ehbemt481/files/documents/2022-04/novel-coronavirus-update3.pdf.

routinely referenced federal regulations of the CDC and World Health Organization in order to provide guidance to health care providers in their care and treatment of COVID-19.

c.  On February 28, 2020, the CDC issued another update to the interim guidance, including guidelines on testing. The CDC indicated that the CDC, state and local health departments, other federal agencies, and other partners were implementing measures to slow and contain transmission of COVID-19 in the United States. These measures include assessing, monitoring, and caring for travelers arriving from areas with substantial COVID-19 transmission and identifying cases and contacts of cases in the United States.[9]

d.  On March 2, 2020, the NHDHHS issued a health alert indicating that the CDC website had been updated with specific instruction for long term care providers and asked that long term care providers review same.[10]

e.  The CDC continued to issue directive and guidance regarding infection prevention in nursing homes, and other long term care facilities, including assisted living facilities, including guidance on PPE, testing, visitation, vaccinations, screening, and isolation.[11]

f.  On March 10, 2020, the HHS Secretary issued the required Declaration invoking the PREP Act for the COVID-19 pandemic, effective February 4,

---

[9] Centers for Disease Control and Prevention, Update to Interim Guidance on Outbreak of 2019 Novel Coronavirus (February 28, 2020) (available at https://emergency.cdc.gov/han/HAN00428.asp).

[10] N.H. Department of Health and Human Services, 2019 Novel Coronavirus (2019-nCOV) Update #5 (March 2, 2020), https://www.COVID19.nh.gov/sites/g/files/ehbemt481/files/documents/2022-04/COVID-19-update5.pdf.

[11] Centers for Disease Control and Prevention, Guidance to Nursing Homes and Long-Term Care Facilities (available at https://cdc.gov/coronavirus/2019-ncov/hcp/nursing-home-long-term-care.html).

128642444v.1
101356871

2020, determining that "the spread of SARS-CoV-2 or a virus mutating therefrom and the resulting disease COVID-19 constitutes a public health emergency."[12] The Declaration delineated that the PREP Act's liability immunity was in effect for the distribution, administration, or use of one or more covered countermeasures and recommended the administration and use of "Covered Countermeasures" to combat COVID-19.

g.   On March 13, the Governor of New Hampshire declared a State of Emergency due to COVID-19. N.H. Exec. Order No. 2020-04 (March 13, 2020),https://www.governor.nh.gov/sites/g/files/ehbemt336/files/documents/2020-04.pdf.

h.   On March 18, the NHDHHS issued a health alert with instructions for testing, including testing criteria, symptoms, and isolation.[13]

i.   On April 14, 2020 the NHDHHS issued a health alert with further instructions to long term care facilities regarding testing for COVID-19. The alert also provided instructions on the use of PPE and masks.[14]

13. At all relevant times, Defendant was acting as part of the critical infrastructure, and "acting under" federal officer authority, at the specific instruction and oversight of the federal government. Defendant's actions were taken in an "effort to assist, or to help carry out, the duties or tasks" dictated by the federal government in order to help prevent the spread of COVID-19. The Covid-19 pandemic was a nation-wide threat that could not be contained by the federal government without assistance

---

[12] Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 FR 15198-01 (March 10, 2020) ("Declaration" or "COVID-19 Declaration").
[13] N.H. Department of Health and Human Services, 2019 Novel Coronavirus (2019-nCOV) Update #9 (March 18, 2020), https://www.COVID19.nh.gov/sites/g/files/ehbemt481/files/documents/2022-04/COVID-19-update9.pdf.

[14] N.H. Department of Health and Human Services, 2019 Novel Coronavirus (2019-nCOV) Update #12 (April 14, 2020), https://www.COVID19.nh.gov/sites/g/files/ehbemt481/files/documents/2022-04/COVID-19-update12.pdf.

22

from the private sector operators of critical infrastructure. Defendant shared in the responsibility of the Healthcare and Public Health Sector to stop the spread of Covid-19. Specifically, Defendant carried out guidance of federal agencies by following directives regarding infection control, PPE, testing, screening of residents and staff, and other COVID-19 related preventions.

14. Defendant's actions were carried out for or relating to the asserted official authority provided to them as part of the Nation's critical infrastructure. The First Circuit's nexus standard is not a "causal" requirement and is not to be understood as anything more than a "related to" nexus. Moore, Supra, at 35.

15. Here, the Plaintiff asserts that the Defendant was negligent in its care and treatment of Leo and Anna Barron related to IPC protocols and internal policies created to address the COVID-19 pandemic. The Plaintiff's wrongful death claims arise from the actions of the employees at Defendant facility in the early days of the COVID-19 pandemic. Defendant's preparation for and response to the COVID-19 pandemic were directly related to the orders and directives issued by the federal government to it. There is a clear nexus between the claims against Defendant and the actions taken by Defendant and the action of the federal government with respect to the response to the pandemic at the facility and administration of covered countermeasures to the decedents.

16. Lastly, Defendant intends to assert colorable federal defenses. For purposes of removal, the defense must be "colorable" and need not to be "clearly sustainable" as the purpose of the removal statute is to secure the validity of the defense that may be tried in federal court. Willingham v. Morgan, 395 U.S. 402, 407 (1969). A defense is colorable "unless it is immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous. Moore, supra, quoting Zerinque v. Crane Co., 846 F.3d 785,790 (5ᵗʰ Cir. 2017).  For this prong, the "burden is low" and the requirement has "generally not been proven an obstacle in similar litigation. Id. at 36.

17. As a colorable federal defense, the Defendant asserts an immunity and express "ordinary" defensive preemption, as well as failure to exhaust administrative remedies, under the PREP Act as set forth in 42 U.S.C. 247d-6d(a)(1). As set forth herein, Congress enacted the PREP Act to encourage and coordinate a thorough, rapid, and comprehensive response to declared public health emergencies. 42 U.S.C.A. § 247d-6d(b). It grants broad immunity to covered persons, such as front-line healthcare workers and other entities who deploy approved countermeasures, from suit and liability for claims of loss related to the administration or use of covered countermeasures so that they may combat the emergency without fear of later litigation and further expressly preempts those claims, requiring that claims be filed with the Fund. See, Defendant's Notice of Removal pp. 6-12. Thus, the claims in the Plaintiff's Complaint invoke federal officer removal jurisdiction.

## VI.   PLAINTIFF'S COMPLAINT PRESENTS A SUBSTANTIAL, EMBEDDED QUESTION OF FEDERAL LAW

1. Federal question also exists because there is a substantial, embedded question of federal law. See Grable & Sons Metal Prods. v. Darue Eng'g & Mfg., 545 U.S. 308 (2005). In Grable, the Supreme Court set forth a two-step process for determining whether a state law claim "arises" under federal law. First, the state law claim must necessarily raise a stated federal issue, actually disputed and substantial. Second, Federal courts must be able to entertain the state law claims "without disturbing and congressionally approved balance of state and federal judicial responsibility." Id.

2. The first prong of the Grable test is met in this case, as Plaintiff has alleged that Leo and Anna Barron died as the result of ineffective use and administration of covered countermeasures. By their nature, these allegations invoke a substantial federal question as to whether the sweeping immunity of the PREP Act applies to Defendant's actions.

3. Plaintiff's challenge to Defendant's use and administration of PPE and compliance with CDC protocols and internal policies relating to other countermeasures, as well as their program

planning, raises a question of federal law. This case will necessarily focus on how covered countermeasures were administered and used in the care of Leo and Anna Barron under the PREP Act. Such analysis involves a substantial federal question.

4. The second prong is also met because this Court would not "disturb any congressionally approved balance of federal and state responsibilities" by taking jurisdiction in this matter. The PREP Act expresses a clear intention to preempt state control of the issues raised in the Plaintiff's Complaint: "no State or political subdivision of the State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirements that — (A) is different from, or s in conflict with, any requirement applicable under this section; and (B) relates to the ... use ...or administration by qualified persons of the covered countermeasure...." 42 U.S.C.A. § 247d-6d(b)(8)." Thus, this Court would not be disturbing on any balance of state and federal interest when it is clear that Congress intended for the federal court to have jurisdiction over this case.

## VII.   CONCLUSION

For the foregoing reasons, jurisdiction exists over this removed matter.

> Respectfully submitted,
> Defendant, Benchmark Senior Living LLC d/b/a
> Greystone Farm at Salem,
>
> MORRISON MAHONEY LLP
>
> By   _/s/ Joseph M. Desmond_
> Joseph M. Desmond, N.H. Bar # 16636
> jdesmond@morrisonmahoney.com
> 250 Summer Street
> Boston, MA 02210
> Phone:   617-439-7554
> Fax:      617-342-4935

128642444v.1
101356871

## <u>CERTIFICATE OF SERVICE</u>

  The undersigned hereby certifies that he caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the United States District Court for the District of New Hampshire by filing through the CM/ECF system, which served a copy of the foregoing upon all counsel of record on August 15, 2022:

<em><strong>/s/ Joseph M. Desmond</strong></em>

Joseph M. Desmond

26

128642444v.1
101356871

EXHIBIT A

128642444v.1
101356871

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
SUPERIOR COURT

Rockingham Superior Court
Rockingham Cty Courthouse/PO Box 1258
Kingston NH 03848-1258

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## SUMMONS IN A CIVIL ACTION



Case Name: **Linda Barron, et al v Benchmark Senior Living, LLC**
Case Number: **218-2022-CV-00512**

Date Complaint Filed: June 28, 2022

A Complaint has been filed against Benchmark Senior Living, LLC in this Court. A copy of the Complaint is attached.

## The Court ORDERS that ON OR BEFORE:

| | |
|---|---|
| August 19, 2022 | Linda Barron; Linda Barron Executrix of the Estates of Leo and Anna Barron shall have this Summons and the attached Complaint served upon Benchmark Senior Living, LLC by in hand or by leaving a copy at his/her abode, or by such other service as is allowed by law. |
| September 09, 2022 | Linda Barron; Linda Barron Executrix of the Estates of Leo and Anna Barron shall electronically file the return(s) of service with this Court. Failure to do so may result in this action being dismissed without further notice. |
| 30 days after Defendant is served | Benchmark Senior Living, LLC must electronically file an Appearance and Answer or other responsive pleading form with this Court. A copy of the Appearance and Answer or other responsive pleading must be sent electronically to the party/parties listed below. |

**Notice to Benchmark Senior Living, LLC:** If you do not comply with these requirements you will be considered in default and the Court may issue orders that affect you without your input.

Send copies to:
Ryan L. Russman, ESQ
Benchmark Senior Living, LLC

Russman Law Offices 14 Center St Exeter NH 03833
201 Jones Road Third Floor West Waltham MA 02451

BY ORDER OF THE COURT

July 05, 2022

Jennifer M. Haggar
Clerk of Court

(126987)

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Rockingham Superior Court
Rockingham Cty Courthouse/PO Box 1258
Kingston NH 03848-1258

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE TO DEFENDANT

Case Name:       **Linda Barron, et al v Benchmark Senior Living, LLC**
Case Number:     **218-2022-CV-00512**

You have been served with a Complaint which serves as notice that this legal action has been filed against you in the **Rockingham Superior Court.** Review the Complaint to see the basis for the Plaintiff's claim.

Each Defendant is required to electronically file an Appearance and Answer 30 days after service. You may register and respond on any private or public computer. For your convenience, there is also a computer available in the courthouse lobby.

If you are working with an attorney, they will guide you on the next steps. If you are going to represent yourself in this action, go to the court's website: www.courts.state.nh.us, select the Electronic Services icon and then select the option for a self-represented party.

1. Complete the registration/log in process. Click Register and follow the prompts.

2. After you register, click Start Now. Select **Rockingham Superior Court** as the location.

3. Select "I am filing into an existing case". Enter **218-2022-CV-00512** and click Next.

4. When you find the case, click on the link and follow the instructions on the screen. On the "What would you like to file?" screen, select "File a Response to Civil Complaint". Follow the instructions to complete your filing.

5. Review your Response before submitting it to the court.

**IMPORTANT:** After receiving your response and other filings the court will send notifications and court orders electronically to the email address you provide.

A person who is filing or defending against a Civil Complaint will want to be familiar with the Rules of the Superior Court, which are available on the court's website: www.courts.state.nh.us.

Once you have registered and responded to the summons, you can access documents electronically filed by going to https://odypa.nhecourt.us/portal and following the instructions in the User Guide. In that process you will register, validate your email, request access and approval to view your case. After your information is validated by the court, you will be able to view case information and documents filed in your case.

If you have questions regarding this process, please contact the court at 1-855-212-1234.

Filed
File Date: 6/28/2022 2:22 PM
Rockingham Superior Court
E-Filed Document

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

Court Name: **Rockingham Superior Court**

Case Name: **Linda Barron Individually and as Executrix of the Estates of Leo Barron and Anna Barron**
v. Benchmark Senior Living, LLC dba Greystone Farm at Salem

Case Number:
(if known) **218-2022-CV-00512**

## COMPLAINT

Requested: ☑ Jury Trial (as allowed by law) ☐ Bench

Trial 1. Plaintiff's Name **Linda Barron, Individually and as Executrix for the Estates of Leo and Anna Barron**

Residence Address **415 Arah St., Manchester, New Hampshire 03104**

Mailing Address (if different) **PO Box 205, Londonderry, NH 03053**

Telephone Number (Home) **(617) 605-6366** (Mobile) _____

2. Defendant's Name **Benchmark Senior Living, LLC d/b/a Greystone Farm at Salem**

Residence Address **201 Jones Rd., Third Floor West, Waltham, MA, 02451, USA**

Mailing Address (if different) **NH Registered Agent: Corporation Service Company**
10 Ferry St Ste 313, Concord, NH, 03301

3. First thing that happened (in one sentence):
**Please see attached.**

4. Second thing that happened (in one sentence):

_____

_____

_____

_____

5. Third thing that happened (in one sentence):

_____

_____

_____

_____

Continue on using separately numbered paragraphs (attach additional sheets if necessary).

NHJB-2688-Se (07/01/2018)  Page 1 of 2

Case Name: <u>Linda Barron Individually and as Executrix of the Estates of Leo Barron and Anna</u>

Case Number: _____

<u>**COMPLAINT**</u>

For the reasons stated in this Complaint, I request that the Court issue the following orders:

A. Describe the orders you want the Court to make:

**Please see attached.**

B. All other relief the Court deems fair and just.

| Ryan L. Russman | | | /s/Ryan L. Russman | 6/28/2022 |
|---|---|---|---|---|
| Name of Filer | | | Signature of Filer | Date |
| Russman Law | 14238 | | (603) 772-3433 | |
| Law Firm, if applicable | Bar ID # of attorney | | Telephone | |
| 14 Center St. | | | ryan@russmanlaw.com | |
| Address | | | E-mail | |
| Exeter | NH | 03833 | | |
| City | State | Zip code | | |

EXHIBIT B

128642444v.1
101356871

THE STATE OF NEW HAMPSHIRE

ROCKINGHAM, SS          SUPERIOR COURT          JUNE 2022 TERM
                                               218-2022-CV-00512

LINDA BARRON INDIVIDUALLY AND AS EXECUTRIX
OF THE ESTATE OF LEO BARRON AND THE ESTATE OF ANNA BARRON

V.

BENCHMARK SENIOR LIVING, LLC D/B/A GREYSTONE FARM AT SALEM

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

**NOW COMES** Linda Barron, Plaintiff in the above-entitled matter, by and through her
attorney, Ryan L. Russman, Esquire, and hereby respectfully submits this Complaint on behalf of
the Estate of Leo Barron and the Estate of Anna Barron under the authority granted to her
pursuant to RSA 556:19; and, seeks all compensatory damages for their wrongful deaths
negligently caused by Defendant pursuant to RSA 556:12 and Common Law. In support thereof,
Plaintiff states as follows:

### **The Parties**

1.    Plaintiff, Linda Barron is a surviving, adult daughter of Leo and Anna Barron and the
Executrix of the Estates of Leo and Anna Barron as appointed by the 10th Circuit Probate Court -
Brentwood. At all times relevant hereto, Leo and Anna Barron were residents of Greystone
Farm at Salem, located at 242 Main Street in the town of Salem, County of Rockingham, State of
New Hampshire 03079; Plaintiff, Linda Barron was an individual residing at 415 Arah Street in
the City of Manchester, County of Hillsborough, State of New Hampshire 03104.

2.    Defendant, Benchmark Senior Living, LLC, is a foreign, limited liability company
with a principal location of 201 Jones Road Third Floor West in the city of Waltham,
Commonwealth of Massachusetts 02451. At all times relevant hereto, Defendant was operating
an assisted living facility, Greystone Farm at Salem, located at 242 Main Street in the town of
Salem, County of Rockingham, State of New Hampshire 03079, and where the events and
omissions giving rise to these claims occurred.

### Jurisdiction and Venue

3.    Because the events and omissions giving rise to these claims occurred at Greystone Farm at Salem, 242 Main Street in Salem, New Hampshire; Leo and Anna Barron were residents of Greystone at such times that their claims arose; and, the Defendant transacts business in the State of New Hampshire, jurisdiction and venue of the within cause of action is properly vested in this Court.

4.    Plaintiff seeks compensatory damages pursuant to RSA 556:12 and controlling NH common law and case law within the minimum and maximum jurisdictional limits of this Court, together with all expenses, costs and interest.

### Facts/Background

5.    In or around 2018, Leo Barron was admitted to Greystone Farm at Salem, an assisted living facility, as a paying resident for the purpose of receiving protective care and oversight and all other necessary care for his existence because he was incapable of caring for himself.

6.    In or around 2018, Anna Barron was admitted to Greystone Farm at Salem, an assisted living facility, as a paying resident for the purpose of receiving protective care and oversight and all other necessary care for her existence because she was incapable of caring for herself.

7.    On January 31, 2020, the United States Department of Health and Human Services declared a national public health emergency as a result of the COVID-19 virus.

8.    On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a global pandemic.

9.    On March 13, 2020, President Donald Trump declared a National Emergency in response to the COVID-19 outbreak.

10.   On March 13, 2020, Governor Christopher Sununu issued an Order declaring a state of emergency as a result of the COVID-19 outbreak.

11.   In late February/early March 2020, the Center for Disease Control issued nationwide, detailed, infection prevention and control (IPC) protocols to healthcare providers and long-term care facilities in response to the COVID-19 pandemic.  These protocols required healthcare

providers and workers to utilize Personal Protective Equipment (PPE), including gowns, gloves, face shields, facemasks and/or respirators or other equipment designed to prevent the spread of Covid-19; and, required that aerosol generating procedures be administered in the patient's room and following a specific pre and post treatment disinfecting procedure.

12.   In early March 2020, the Senior Vice President of Operations for Defendant began issuing regular COVID-19 email bulletins to residents and family members in response to the outbreak, acknowledging the CDC's protocols and repeatedly assuring residents and family members that their residential care attendants, clinical staff and subcontractors were all following the CDC's IPC protocols.

## Count I
## (Wrongful Death)

13.   Plaintiff repeats the allegations made in the preceding paragraphs, incorporates the allegations by reference herein and by way of further allegations, states as follows:

14.   At all times relevant hereto, both Leo and Anna Barron were in frail, defenseless, and dependent conditions.  As a result of their frail, defenseless, and dependent conditions, Leo and Anna Barron relied upon Defendant to provide for their safety, protection, care, and treatment.

15.   As residents of Greystone Farm at Salem, Leo and Anna Barron were entitled to proper nursing and staff care.

16.   At all times relevant hereto, Defendant was acting by and through their doctors, nurses, administrators, agents, servants, and employees in providing care to Leo and Anna Barron.

17.   At all times relevant hereto, the doctors, nurses, administrators, agents, servants, and employees of Defendant that provided care to Leo and Anna Barron were acting within the course and scope of their employment and/or relationship with Defendant.

18.   At all times relevant hereto, Defendant owed a non-delegable, professional duty of care to the residents of Greystone Farm at Salem including to Leo and Anna Barron such duties being conferred by statute, existing at common law and/or being voluntarily assumed by the Defendant.

19. Nevertheless, and wholly unmindful and regardless of Defendant's non-delegable, professional duty of care, the Defendant did fail in the performance thereof. More specifically, despite the known seriousness of the pandemic, the known transmissibility of the virus and the known mortality rate of the elderly and at-risk population, Leo and Anna Barron's residential care attendants and clinical staff *routinely* and negligently administered care to Leo and Anna Barron, interacted with them and entered their room without utilizing required PPE, if any at all. Additionally, Leo Barron's nebulizer machine was routinely removed from his room and treatments administered in the community area without proper pre and post disinfecting procedures. Moreover, Greystone staff regularly allowed Mr. and Mrs. Barron as well as other Greystone Farm at Salem residents, to be in the community areas of the facility without facemasks on themselves and/or failed to encourage social distancing protocols. All of the actions and inactions described herein, rest in sharp contrast not only with the CDC's IPC protocols, but Defendant's own internal policies and IPC protocols;

20. Predictably and due to Defendant's negligent acts as described more fully above, Leo and Anna Barron contracted COVID-19 from exposure in Defendant's facility while they were residents.

21. On or before March 13, 2020, Defendant knew or should have known the vital importance of ensuring that COVID-19 did not enter or spread in its facility. This included screening staff and vendors entering the facility, especially those who were returning to work after traveling, monitoring residents, staff and vendors for fever, cough, and other symptoms of COVID, following the CDC's Infection Control Protocols, and adhering to social distancing guidelines;

22. As a direct, foreseeable and proximate of the Defendant's breach of their duty of care, negligence and recklessness, Leo and Anna Barron each suffered severe pain, anxiety, mental distress, and ultimately death. Pursuant to RSA 556:12, the Plaintiff Estates claims the following compensatory damages:

> a) Economic Loss to the Estates;
>
> b) Conscious pain and suffering;
>
> c) Medical Bills;
>
> d) Funeral Expenses;

e) All financial losses to the Estates, including attorney fees and costs associated with administration of the Estates; and

f) Loss of the Enjoyment of Life (hedonic damages) of Leo and Anna Barron;

## Count II

### (Violation of RSA 151 et seq.)

23.      Plaintiff repeats the allegations made in the preceding paragraphs, incorporates the allegations by reference herein and by way of further allegations, states as follows:

24.      At all times relevant hereto, Defendant's facility, Greystone Farm at Salem, is a "facility" under RSA 151, 19, II and as such, Defendant owed Leo and Anna Barron statutory duties enumerated in RSA 151:21.    Defendant's actions as described herein, constitute a violation of RSA 151:21; and, as a direct and proximate result of these statutory violations, Plaintiff Estates are entitled to damages, all to the damage of the Plaintiff Estates in an amount within the minimum and maximum jurisdictional limits of this Court.

## Count III

### (Violations of the Consumer Protection Act)

25.      Plaintiff repeats the allegations made in the preceding paragraphs, incorporates the allegations by reference herein and by way of further allegations states as follows:

26.      Defendant's negligence, breach of duties, and failure to provide appropriate care and oversight, constitute unfair and deceptive acts and practices in violation of the New Hampshire Consumer Protection Act, RSA 358-A.

27.      As a direct and proximate result of Defendant's violations of RSA 358-A, the Plaintiff Estates were caused to suffer all of the damages and losses as aforesaid; that based on the entire nature of Defendant's negligence, breaches of duties and failure to provide appropriate care, as well as Defendant's treatment of Leo and Anna Barron, the Defendant's misconduct constitutes a reckless and/or willful and/or knowing violation under RSA 358-A:10, I; all to the damage of Plaintiff Estates within the minimum and maximum jurisdictional limits of this Court, plus interest, costs, attorneys' fees and the mandatory doubling and discretionary trebling of compensatory damages and losses pursuant to RSA 358-A:10, I.

**WHEREFORE** the Plaintiff prays that this Honorable Court:

A.      That orders of notice be issued for service on the Defendant;

B.      That the Plaintiff Estates be granted a jury trial;

C.      That judgment be entered in Plaintiff Estates' favor in amounts within the

minimum and maximum jurisdiction of this Court, together with costs and interest; and,

D.      For such other relief as may be deemed necessary and just.

Respectfully submitted,

Dated:   6/20/22

Linda Barron, as Executrix for:
The Estate of Leo Barron; and,
The Estate of Anna Barron

RUSSMAN LAW OFFICES

Dated:    6/28/2022

By:      /s/ Ryan L. Russman
         Ryan L. Russman (NHB 14238)
         14 Center Street
         Exeter, NH 03833
         T: (603) 772-3433; F: (603) 772-5895

**OATH**

STATE OF NEW HAMPSHIRE
ROCKINGHAM, SS.

         Personally appeared, before me, the above-named Linda Barron who took oath that the
above facts are true and accurate to the best of her knowledge and belief.

Dated:  6/20/2022

Notary Public/Justice of the Peace
My commission expires:

ROBIN L. HILMAN-HEALEY
NOTARY PUBLIC - State of New Hampshire
My Commission Expires
March 23, 2027

EXHIBIT C

128642444v.1
101356871

## Merrimack County Sheriff's Office

DAVID A. CROFT
333 Daniel Webster Hwy
Boscawen, NH 03303
Phone: 603-796-6600

BENCHMARK SENIOR LIVING, LLC
10 FERRY ST    313
CONCORD, NH 03301

AFFIDAVIT OF SERVICE

MERRIMACK, SS

7/14/2022

I, Deputy TAYLOR A CARON, on this date at 1440 a.m./p.m., summoned
the within named defendant BENCHMARK SENIOR LIVING, LLC as within
commanded, by leaving at the office of Registered Agent Corporation Service
Company, 10 Ferry Street, Suite 313, Concord, said County and State of New
Hampshire, its true and lawful agent for service of process under and by
virtue of Chapter 293-A New Hampshire RSA, as amended, a true and attested
copy of this Summons and Complaint.

FEES

|         |         |
|---------|---------|
| Service | $30.30  |
| Postage | 1.00    |
| Travel  | 15.00   |

TOTAL      $46.30

A TRUE COPY ATTEST:

Deputy Taylor Caron
Merrimack County Sheriff's Office

Deputy TAYLOR A CARON
Merrimack County Sheriff's Office